IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| CHRIS FULLER, an individual, | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : | No.: |
| v. | : | Hon. |
|  | : |  |
| DEAN TRANSPORTATION, INC., a | : |  |
| Michigan corporation, | : |  |
|  | : |  |
| Defendant. | : |  |

## COMPLAINT AND JURY DEMAND

Plaintiff, Chris Fuller ("Plaintiff" or "Mr. Fuller"), by and through his attorneys, Kreis, Enderle, Hudgins & Borsos, PC, and for his Complaint against Defendant, Dean Transportation, Inc. ("Defendant" or "Dean"), states as follows:

## PARTIES

1.      Plaintiff is an individual residing in Grand Rapids, Michigan.

2.      Defendant is a corporation authorized to do business in the state of Michigan, with its registered office located at 4812 Aurelius Road, Lansing, Michigan 48910.

3.      Defendant is in the transportation business and offers various transportation services to individuals, businesses, church groups, municipalities, universities, and other schools. In addition, Dean offers various transportation management and consulting services to transit agencies, municipalities, universities, and school districts throughout Michigan.

## JURISDICTION AND VENUE

4.      This is an action for relief from employment discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended*, and the Michigan Elliott-Larsen Civil Rights Act, which occurred in Grand Rapids, Michigan.

5.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

7.      Mr. Fuller began working as a bus driver for Dean in July 2015.

8.      Throughout his employment with Dean, Mr. Fuller was an exemplary and faithful employee.

9.      Throughout his employment with Dean, Mr. Fuller never disclosed, and Dean did not ask about, Mr. Fuller's sexual orientation.

10.     Mr. Fuller is a homosexual man.

### Mr. Fuller Begins a Homosexual Relationship with an Adult College Student

11.     On April 27, 2018, Mr. Sean Pennington ("Mr. Pennington") initiated a conversation with Mr. Fuller via the "Growlr" application on his phone.

12.     Growlr is a mobile chat and dating application for gay men.

13.     Mr. Pennington identified himself to Mr. Fuller as a 21-year-old male who attended Grand Valley State University.

14.     Messrs. Fuller and Pennington became friendlier as their online discussions continued.

15.     On May 7, 2018, Mr. Pennington and Mr. Fuller decided to meet and began a brief dating relationship that lasted approximately one week.

16.     On May 14, 2018, Mr. Fuller discovered that Mr. Pennington frequently rode one of Dean's busses to attend Grand Valley State University.

17.     Mr. Fuller never encountered Mr. Pennington through his employment with Dean.

18.     Mr. Fuller never operated a Dean bus on which Mr. Pennington was a passenger.

19.     The fact that Mr. Pennington happened to ride a Dean bus was purely a coincidence.

20.     However, once the discovery was made, Mr. Fuller decided to end the dating relationship during an in-person conversation held on May 15, 2018.

21.     Mr. Fuller ended his dating relationship with Mr. Pennington only because he did not want Dean to somehow discover his sexual orientation.

<u>**Dean Learns of Mr. Fuller's Homosexual Relationship,<br>Conducts a Preliminary Interview, and Takes Adverse Action**</u>

22.     On May 16, 2018, Dean's Operations Manager, Brandon Knapp, received a call from Mr. Fuller's supervisor, Valerie Conklin, complaining that Mr. Fuller was having an "inappropriate relationship" with a "Dean student."

23.     Ms. Conklin learned of Messrs. Fuller and Pennington's dating relationship by way of a call from Mr. Pennington's mother, who did not approve of the relationship or Mr. Pennington's sexual orientation.

24.     Mr. Knapp subsequently completed an Incident Report Form which stated that Ms. Conklin was "extremely upset and emotional" when making her complaint about Mr. Fuller.

25.     According to the Incident Report Form, Mr. Knapp "immediately" called Dean's Director of Operations (Esther Sandford) to report Ms. Conklin's complaint as "a critical incident."

26.     On the same day, Mr. Fuller was summoned for an in-person interview that was conducted by Mr. Knapp and Dean's Compliance Manager, Mark Murray.  Mr. Fuller's union representative, Robin Blanton, also attended the interview.

27.     Mr. Fuller explained during the interview that he never drove a bus on which Mr. Pennington was a passenger and otherwise never encountered Mr. Pennington through his employment with Dean.

28.     During this interview, it was brought to Mr. Fuller's attention that Dean learned, through Mr. Pennington's mother, that Mr. Pennington has autism.

29.     However, Mr. Pennington did not disclose his autism to Mr. Fuller during their brief dating relationship.

30.     Presumably because Mr. Pennington is on the low-end of the autism spectrum and appears to be a high-functioning individual, this fact was also not apparent to Mr. Fuller during their brief dating relationship.

31.     During all times relevant to this Complaint, Mr. Pennington did not require a legal guardian and was able to make his own decisions as an adult.

32.     On May 17, 2018, Dean placed Mr. Fuller on administrative leave pending further investigation.

**Dean Summons Mr. Fuller for a Second Interview**

33.     On May 22, 2018, Dean summoned Mr. Fuller for a second interview.

34.     Dean's stated purpose of this second interview was "to confirm the date [Mr. Fuller] knew [Mr. Pennington] was transported by Dean Transportation and to confirm if they had meet [*sic*] face to face after [Mr. Fuller] learned this information."

35.     Present at this second interview were Mr. Fuller and his union representative, and for Dean, Messrs. Knapp and Murray.

36.     Dean asked Mr. Fuller whether he and Mr. Pennington had met on May 15th and whether they "were intimate" or had "any physical contact" after he found out that Mr. Pennington rode a Dean bus.

37.     Mr. Fuller stated there was some "touching and hugging" on May 15th but that he ended the dating relationship that day.

38.     During this second interview, Mr. Fuller again reiterated that he never, at any time, encountered Mr. Pennington through his employment with Dean.

### Dean Unlawfully Terminates Mr. Fuller's Employment

39.     At the conclusion of the second interview, despite the explanation from Mr. Fuller, Dean terminated Mr. Fuller and provided him with a termination letter dated May 22, 2018.

40.     The letter, authored by Mr. Knapp, explained that Mr. Fuller was terminated because of an "inappropriate relationship with a fellow dean student."

41.     The letter also cited purported violations of Dean's Standard Operating Procedures: SBA-A-1, General, IX, (4) Integrity; SB-A-1, General, IX (5) Accountability; and SB-A-2, Code of Conduct (d).

42.     The letter further stated that "we conclude that you have been grossly negligent or have willfully disregarded company policies and procedures."

43.     Dean's cited Standard Operating Procedures state as follows:

**SB-A-1 Introduction and Philosophy**

1.02 General

\*          \*          \*

IX.     The purpose of this Standard Operating Procedures manual is to provide every employee with the policies and procedures that were developed to ensure that all operational priorities are met.  Every standard operating procedure is developed to support the following key business objectives:

\*          \*          \*

4.      Integrity: Honesty is required in all interactions with passengers, fellow employees and the general public.  The relationship between Dean Transportation and each employee is based on trust resulting from mutual respect.

5.      Accountability: Employees must accept responsibility for their actions.  Employees will be held accountable for consequences of their actions.

\*          \*          \*

**SB-A-2 Code of Conduct**

2.02 Code of Conduct

I.      Employees are responsible to:

\*          \*          \*

d.      Ensure personal interests do not conflict with official duties, by avoiding both actual and perceived conflicts of interest when dealing with vendors, customers, and other individuals who do business or seek to do business with the company.

(emphasis added).

44.     None of these cited policies provide *any* legitimate basis to terminate Mr. Fuller's employment in light of his consensual dating relationship with another adult male outside of the workplace.

45.     Mr. Fuller was terminated because of his sexual orientation, in violation of state and federal law and Dean's own written policy expressly prohibiting discrimination on the basis of sexual orientation.

### Dean's Discriminatory Conduct Continues Post-Employment

46.     Shortly after his wrongful termination, Mr. Fuller filed for unemployment benefits through the Michigan Unemployment Insurance Agency.

47.     However, Dean continued its discriminatory crusade against Mr. Fuller by challenging his application for unemployment benefits with a false assertion that he was fired for "misconduct."

48.     At the unemployment hearing, Mr. Knapp testified that he believed the homosexual relationship between Messrs. Fuller and Pennington could have a negative impact on Dean's reputation.

49.     On August 23, 2018, Administrative Law Judge Katherine Talbot issued a ruling finding that Mr. Fuller was _not_ discharged by Dean for misconduct and that Mr. Fuller was eligible to receive unemployment benefits.

50.     Specifically, her opinion stated that "I do not find that [Mr. Fuller] committed intentional violations of the employer's Code of Conduct policy.  He did not engage in behavior which maliciously brought the employer into disrepute; he did not intend to damage the employer's reputation and he did not intend to impair the employer's operations."  Likewise, the opinion stated that Mr. Fuller's "personal interests did not conflict with his official duties."

51.     Judge Talbot's decision was upheld by the Michigan Compensation Appellate Commission in an Order dated November 16, 2018.

52.     In August 2018, Mr. Fuller was able to find comparable employment as a bus driver with Forest Hills Public Schools.

53.     However, on September 13, 2018, Mr. Fuller was terminated from his employment with Forest Hills Public Schools after Dean informed Forest Hills that Mr. Fuller was fired for "unprofessional conduct."

54.     As a result of Dean's discriminatory acts, Mr. Fuller cannot find comparable work despite his best efforts.

55.     Mr. Fuller timely filed a charge of discrimination with the Equal Employment Opportunity Commission and the Michigan Civil Rights Commission and brings this action with 90 days of receiving his notice of right to sue.

<u>**COUNT I**</u>
<u>**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2(a)**</u>
<u>**DISCRIMINATION BASED ON SEXUAL ORIENTATION**</u>

56.     Plaintiff incorporates by reference the paragraphs above.

57.     At all material times, Defendant was Plaintiff's employer, covered by and within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII").

58.     Title VII prohibits discrimination on the basis of sex, including sexual orientation. *EEOC v RG*, 884 F.3d 560 (6th Cir. 2018); *Zarda v Altitude Express, Inc*, 855 F.3d 76 (2nd Cir. 2018); *Hively v Ivy Tech Cmty Coll of Indiana*, 853 F3d 339 (7th Cir. 2017); *Baldwin v Foxx*, Appeal No 0120133080 (EEOC July 16, 2015).

59.     Plaintiff was engaged in lawful activity protected by Title VII—that being a consensual homosexual relationship with an adult man outside of the workplace.

60.     At the time of Plaintiff's termination, his sexual orientation was known to Defendant and was a motivating factor that made a difference in Defendant's decision to subject him to the wrongful and discriminatory treatment described above.

61.     Defendant, by its agents, representatives, and employees, was predisposed to discriminate on the basis of sexual orientation and acted in accordance with the predisposition.

62.     Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

63.     If Plaintiff was a heterosexual man, he would not have been treated in the manner described above.

64.     Plaintiff was not fired for a legitimate, nondiscriminatory reason, and Defendant's stated reasons for terminating Plaintiff are pretextual.

65.     As a direct and proximate result of Defendant's wrongful acts and omission, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation.

### COUNT II
### VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT,
### M.C.L. § 37.2101, *et seq.* – DISCRIMINATION BASED ON SEXUAL ORIENTATION

66.     Plaintiff incorporates by reference the paragraphs above.

67.     At all material times, Defendant was Plaintiff's employer, covered by and within the meaning of the Elliott-Larsen Civil Rights Acts Act, M.C.L. § 37.2101, *et seq.*

68.     ELCRA prohibits discrimination on the basis of sex, including sexual orientation. *See* Michigan Civil Right Commission Interpretative Statement 2018-1 (May 21, 2018) (opining that the term "sex" as used in the ELCRA includes sexual orientation).

69.     Plaintiff was engaged in lawful activity protected by the ELCRA—that being a consensual homosexual relationship with an adult man outside of the workplace.

70.     At the time of Plaintiff's termination, his sexual orientation was known to Defendant and was a motivating factor that made a difference in Defendant's decision to subject him to the wrongful and discriminatory treatment described above.

71.     Defendant, by its agents, representatives, and employees, was predisposed to discriminate on the basis of sexual orientation and acted in accordance with the predisposition.

72.     Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

73.     If Plaintiff was a heterosexual man, he would not have been treated in the manner described above.

74.     Plaintiff was not fired for a legitimate, nondiscriminatory reason, and Defendant's stated reasons for terminating Plaintiff are pretextual.

75.     As a direct and proximate result of Defendant's wrongful acts and omission, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests relief and damages as follows:

a.      A declaratory judgment that Defendants' actions alleged herein violated the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and attendant regulations;

b.      A declaratory judgment that Defendants' actions alleged herein violate Michigan's Elliott-Larsen Civil Rights Acts Act, M.C.L. § 37.2101, *et seq.*, and attendant regulations;

c.      Granting a monetary judgment in favor of Plaintiff and against Defendants and awarding Plaintiff all economic damages, liquidated damages, compensatory damages, and punitive damages available under the law;

d.      Awarding reasonable attorneys' fees and costs incurred by Plaintiff in filing this action as provided by statute;

e.      Awarding pre- and post-judgment interest to Plaintiff on these damages; and

f.      Awarding such other and further legal or equitable relief as this Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Date:  January 24, 2019              Respectfully Submitted,

KREIS, ENDERLE, HUDGINS & BORSOS, P.C.

_____
Jesse L. Young (P72614)
Daniel W. Boocher (P81550)
40 Pearl St. N.W., 5th Floor
Grand Rapids, Michigan 49503
(616) 254-8400 Phone
(616) 254-8410 Fax

*Attorneys for Plaintiff*